FILED

08/16/2022

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### May 11, 2022 Session

## STATE OF TENNESSEE v. BARRY JAMAL MARTIN

**Appeal from the Circuit Court for Giles County**
**No. CR-14901        Stella L. Hargrove, Judge**

_____

### No. M2021-00667-CCA-R3-CD

_____

The Defendant, Barry Jamal Martin, was convicted in the Giles County Circuit Court of possession of one-half gram or more of cocaine with intent to sell, a Class B felony; possession of not less than one-half ounce of marijuana with intent to sell, a Class E felony; and possession of drug paraphernalia, a Class A misdemeanor, and received an effective twelve-year sentence to be served in confinement.  On appeal, the Defendant claims that the evidence is insufficient to support the convictions; that a new trial is required due to the grand jury and the petit jury being exposed to extraneous prejudicial information in the "Confederate jury room"; that the trial court erred by denying defense counsel's motion to be relieved as counsel; that the trial court erred by excluding an undisclosed, exculpatory letter written by the Defendant from evidence; that the trial court erred by allowing a police officer to testify that a person could not possess more than two grams of cocaine for personal use; that the trial court erred by denying alternative sentencing; and that he is entitled to relief due to cumulative error.  Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Evan P. Baddour (on appeal and at motion for new trial hearing), Pulaski, Tennessee, and Beverly White (at trial), Lawrenceburg, Tennessee, for the appellant, Barry Jamal Martin.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Assistant Attorney General; Brent Cooper, District Attorney General; and Rebecca S. Parsons, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## FACTS

In June 2019, the Giles County Grand Jury indicted the Defendant for possession of one-half gram or more of cocaine with intent to sell, possession of not less than one-half ounce of marijuana with intent to sell, and possession of drug paraphernalia. The Defendant went to trial in February 2020.

At trial, Lieutenant Justin Young of the Pulaski Police Department ("PPD") testified that he had been a law enforcement officer for nineteen years; that he had received drug identification training; and that he was required to maintain "40 hours of in-service training per year," which included "narcotics-related" classes. He also had attended a drug interdiction class in Mississippi and had received on-the-job training in the identification of marijuana and cocaine.

Lieutenant Young testified that on April 26, 2019, he was working "third shift" and pulled into the parking lot of the Pulaski Recreation Center at 1:33 a.m. A silver Pontiac was in the parking lot, the driver's seat was "leaned back," and someone appeared to be in the car. Lieutenant Young got out of his patrol car and approached the Pontiac. A man was asleep in the driver's seat. Lieutenant Young shined his flashlight into the Pontiac and saw "a large, clear plastic bag in the center of the back seat that contained a large amount of green leafy substance that [he] knew to be marijuana packaged in several small bags." He "[ran] the tag on the vehicle" and learned the Pontiac was registered to the Defendant. Lieutenant Young identified the Defendant in the courtroom as the man who was in the Pontiac.

Lieutenant Young testified that based on the time of night and the amount of drugs "in plain view in the back seat," he called for other officers to assist him. When they arrived, Lieutenant Young woke the Defendant, placed him in handcuffs, and advised him that he was under arrest for possession of narcotics. Lieutenant Young searched the Defendant and found $800 cash in his pants pocket. The officer removed the large bag of marijuana from the back seat. The bag contained seven different-sized bags of a green, leafy substance and contained one clear bag of a white-powder substance, which later field-tested positive for cocaine. Lieutenant Young weighed the large bag of marijuana on a set of digital scales, and the bag weighed 305 grams. He weighed the bag of cocaine, and it weighed ten grams. Lieutenant Young said that the amounts of marijuana and cocaine were more than an average person would possess for personal use and that he sent the drugs to the Tennessee Bureau of Investigation ("TBI") for analysis.

Lieutenant Young testified that he searched the Pontiac and found about $500 cash in the center console. He also found a set of digital scales and a couple of cellular telephones in the vehicle. Lieutenant Young said that a green, leafy residue was on the lid

of the digital scales and that digital scales were commonly used to weigh narcotics for resale. Lieutenant Young's patrol car recorded the incident, and the State played the video for the jury.

Lieutenant Young testified that the total amount of cash found on the Defendant's person and in the Pontiac was $1,318 and that the money was in the following denominations: one-dollar bills, two-dollar bills, "fives, tens, twenties, fifties," and one-hundred-dollar bills. He said that the denominations were "indicative to the sale of narcotics" and that he did not find any items in the Pontiac, such as a glass smoking pipe or rolling papers, to indicate the Defendant possessed the drugs for personal use. Based on the amount of money, the denominations of the money, the amount of marijuana and cocaine, and the presence of the digital scales, Lieutenant Young charged the Defendant with possession of marijuana for resale and possession of cocaine for resale. He also charged the Defendant with possession of drug paraphernalia for possessing the digital scales.

On cross-examination, Lieutenant Young testified that about eight months before this incident, he found the Defendant sleeping in a vehicle on the opposite side of town. In that case, the Defendant resisted arrest, fought with the police over a marijuana cigarette, and had a pistol under the driver's seat. When Lieutenant Young first encountered the Defendant on April 26, 2019, the Defendant was "sound asleep" in the Pontiac. The Defendant "resembled" the man from the previous incident, and Lieutenant Young verified that the Defendant was the same man via the Defendant's vehicle registration. The Defendant was "very startled" when the police officers woke him on April 26. Lieutenant Young said he did not remember if clothing was on the back seat of the Pontiac.

Rebecca Hernandez, a special agent forensic scientist with the TBI, testified as an expert in the identification and analysis of controlled substances that she analyzed an "off white rock-like substance" found in the Pontiac. The substance was cocaine and weighed 8.29 grams. Agent Hernandez also analyzed "some plant material." The plant material was marijuana and weighed 87.56 grams. Agent Hernandez weighed some additional plant material that was visually consistent with the marijuana, and it weighed 183.87 grams. However, she did not analyze the additional plant material to determine if it was marijuana because the total amount of marijuana was not going to exceed our Code's "cutoff" of ten pounds.

On cross-examination, Agent Hernandez testified that the TBI had a policy and procedure in place to differentiate between hemp and marijuana. In this case, Agent Hernandez "did instrumental analysis to determine that there was greater than one percent THC content in this plant material." Therefore, the plant material that weighed 87.56 grams met the legal definition of "marijuana." The weight of that marijuana did not include any packaging, but the weight of the additional plant material included the packaging. The weight of the cocaine did not include any packaging.

- 3 -

Investigator Gerrod Shirey of the PPD testified that he had been a narcotics investigator since 2011, that he had specialized training in "different narcotics," and that he often used informants to purchase cocaine and marijuana in Giles County. He said that an "eight ball" was "three point five grams (3.5) of whatever illegal narcotics that you are purchasing." In April 2019, an eight ball of cocaine sold for $140 to $160. Therefore, the value of eight grams of cocaine would have been "[p]robably $250." He said "mid-grade" marijuana sold for $60 per gram.

Investigator Shirey testified that the average cocaine user would not consume more than two grams of cocaine per day because cocaine was "a stimulant on the brain" and "gives you a lot of energy and makes you go, you know, all day long." Furthermore, a person "could easily overdose and die" if the person used too much cocaine in one day. The State asked if eight grams of cocaine was a "typical amount" for personal use, and Investigator Shirey answered, "No, ma'am." He said a person who possessed that amount of cocaine either would sell the drug in grams or sell the drug as two eight balls. Eighty-seven grams of marijuana also would not be for personal use. Investigator Shirey said that based on the amounts of drugs and money in this case, he thought the Defendant was selling drugs. At the conclusion of his testimony, the State rested its case.

The thirty-year-old Defendant testified that in April 2019, he was living in Pulaski, was employed by a temporary agency, and was earning $13.75 per hour working at Nissan. On the night of April 25, 2019, the Defendant worked at Nissan until 10:00 p.m. After work, he drove to the Pulaski Recreation Center because he was going to be the "middle man" for a marijuana transaction. The Defendant explained that a man was supposed to meet him at the recreation center and bring him "[a] couple of bags of weed" and that a second man was going to pick up the marijuana. The Defendant was "supposed to get a cut" of the marijuana.

The Defendant testified that the first man arrived at the recreation center about 11:30 p.m. The man put the bag of marijuana on the Defendant's back seat and told the Defendant that "a dude is going to come and pick it up, just wait on him." The Defendant did not know how much marijuana was in the bag, and he did not give the man any money because he thought the second man had already paid for the marijuana. The first man left, and the Defendant fell asleep while he was waiting for the second man to arrive. The Defendant acknowledged that he had prior convictions for simple possession of marijuana and that he was on probation for simple possession at the time of trial. Defense counsel asked why the Defendant had so much money in his possession that night, and the Defendant said he had been saving his money and had cashed his paycheck so he could get his own place to live. The Defendant did not know cocaine was in the bag. He said that he had been employed his entire adult life and that he had never dealt with cocaine.

On cross-examination, the Defendant testified that he slept in his car sometimes but that he was not living in his car in April 2019. He identified a "pay stub" dated February 1, 2019, and acknowledged that it showed he earned $160.31 for the week ending January 27, 2019. He identified a second pay stub dated January 25, 2019, and acknowledged that it showed he earned $424 for the week ending January 20, 2019. A third pay stub showed that he earned $222 for the week ending December 28, 2018. The Defendant's earnings were always directly deposited into his savings account. He was in possession of $1,300 on the night of April 26, 2019, because he was "trying to get a place the next day" and had taken the money out of his savings account. The Defendant said that he could not remember the name of the man who put the marijuana into his car and that he had never met the man prior to April 26. A man named "Justin" was supposed to pick up the marijuana, but the Defendant did not know Justin's last name or where Justin lived. The Defendant wanted his "cut" of the marijuana so he could smoke it.

At the conclusion of the Defendant's testimony, the jury convicted him as charged in the indictment of possession of one-half gram or more of cocaine with intent to sell, possession of not less than one-half ounce of marijuana with intent to sell, and possession of drug paraphernalia. After a sentencing hearing, the trial court sentenced him to concurrent sentences of twelve years, two years, and eleven months, twenty-nine days, respectively.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant claims that the evidence is insufficient to support the convictions because the jury disregarded his testimony that he did not know the cocaine was in the bag, that he was just the middleman for transferring the marijuana, that no money exchanged hands, and that he was to receive a small amount of the marijuana for his personal use. He also claims that the jury disregarded the discrepancies between the amounts of cocaine and marijuana weighed by Lieutenant Young and Agent Hernandez. The State argues that the evidence is sufficient. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

It is an offense for a defendant knowingly to possess a controlled substance with intent to sell the controlled substance. Tenn. Code Ann. § 39-17-417(a)(4). Possession of cocaine with intent to sell when the amount of cocaine is one-half gram or more is a Class B felony. Tenn. Code Ann. § 39-17-417(c)(1). Possession of marijuana with intent to sell when the amount of marijuana is not less than one-half ounce nor more than ten pounds is a Class E felony. Tenn. Code Ann. § 39-17-417(g)(1).

As noted by the State, "It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing." Tenn. Code Ann. § 39-17-419. Our case law has established "other relevant facts" that may give rise to an inference of intent to sell, including the absence of drug paraphernalia, the presence of a large amount of cash, the manner of packaging of the drugs, and the street value of the drugs. *See State v. Belew*, 348 S.W.3d 186, 191 (Tenn. Crim. App. 2005) (citing *State v. Chearis*, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999)); *see also State v. Brown*, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (concluding that the absence of drug paraphernalia and the manner of packaging of drugs supported an inference of intent to sell); *State v. Matthews*, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (concluding that testimony concerning the amount and the street value of the drugs was admissible to prove the defendant's intent).

Taken in the light most favorable to the State, the evidence shows that on April 26, 2019, the Defendant had a bag of marijuana and cocaine on the back seat of his car. The marijuana weighed a minimum of 87.56 grams, and the cocaine weighed 8.29 grams. Although the Defendant claimed that he was just the middleman for a marijuana transaction and that he did not know the cocaine was in the bag, he was in possession of more than

$1,300 in various denominations of cash. The marijuana was packaged into smaller bags, and Lieutenant Young did not find any drug paraphernalia to suggest the Defendant possessed the marijuana or cocaine for personal use. To the contrary, Lieutenant Young found a set of digital scales in the car, and marijuana residue was on the lid of the scales. Lieutenant Young said digital scales were commonly used to weigh narcotics. Investigator Shirey testified that in April 2019, eight grams of cocaine was worth about $250 and that "mid-grade" marijuana was worth $60 per gram. Therefore, assuming arguendo that the 87.56 grams of marijuana was mid-grade marijuana, by our calculations, the value of that marijuana alone would have been worth more than $5,000. The Defendant complains that the jury should have accredited his testimony that he merely was transferring the marijuana between two men, that he did not know the cocaine was present, and that he did not possess the drugs for sale. However, determining the credibility of witnesses is within the purview of the trier of fact. *See State v. Millsaps*, 30 S.W.3d 364, 368 (Tenn. Crim. App. 2000). In this case, the jury chose to accredit the testimony of the State's witnesses.

As to the Defendant's claim that the jury disregarded the discrepancies in the amounts of cocaine and marijuana, Lieutenant Young testified that the bags of marijuana and cocaine weighed 305 grams and ten grams, respectively. Agent Hernandez testified that the marijuana weighed 87.56 grams, that the additional plant material weighed 183.87 grams, and that the cocaine weighed 8.29 grams. However, she weighed the marijuana and the cocaine without any packaging. Therefore, it is logical to this court that the weights obtained by Agent Hernandez were lower than the weights obtained by Lieutenant Young. In any event, the jury, as was its prerogative, obviously resolved any discrepancies in the weights in favor of the State. Therefore, we conclude that the evidence is sufficient to support the Defendant's convictions.

## II. Jury Room

The Defendant claims that a new trial is required due to the grand jury and the petit jury being exposed to extraneous prejudicial information in the "Confederate jury room." The State argues that we should review this issue for plain error because the Defendant failed to raise it before trial. The State further argues that because the Defendant failed to present any proof that jurors were aware of the Confederate memorabilia pursuant to Tennessee Rule of Evidence 606(b), he cannot meet the threshold of showing that they were exposed to extraneous influence; therefore, no unequivocal rule of law was breached. The State also argues that because proof of the Defendant's guilt was overwhelming, consideration of the error is not necessary to do substantial justice. We agree with the State's argument.

The Defendant, who is African American, filed a motion for new trial in which he claimed that the jury's deliberating in an "inherently prejudicial Confederate jury room" violated his right to a fair trial, an impartial jury, due process, and equal protection of the law under the United States Constitution, the Tennessee Constitution, and the Tennessee

Rules of Evidence.  He also claimed that the indictment was defective due the grand jury's being required to meet in the same jury room.

At the motion for new trial hearing, Natalie Oakley testified for the Defendant that she was the Circuit Court Clerk for Giles County and that Giles County juries deliberated "in our jury room," also known as "the U.D.C. room."  She said that "U.D.C." was the acronym for United Daughters of the Confederacy and that "U.D.C. Room" was painted on the door of the jury room.  She identified a photograph of the door and acknowledged that the jury for the Defendant's trial deliberated in the room.

Ms. Oakley testified that the Giles County Grand Jury also deliberated in the room "unless something else was going on at the courthouse and they had to meet at the courthouse annex, which is the [SunTrust] Bank building.  And they would meet in the basement board room."  Defense counsel asked if Ms. Oakley had any reason to think the grand jury that brought the Defendant's charges did not deliberate in the U.D.C. Room, and she said no but that "I would have to go back and look at my calendar to see if any reason they were over at the annex."  Ms. Oakley then identified nine photographs taken inside the jury room, and defense counsel asked her, "As far as you know, has the jury room always looked like this?"  Ms. Oakley responded, "To my knowledge, but . . . I don't make it a habit of going in there[.]"

Defense counsel introduced the ten photographs of the jury room into evidence. The first photograph shows the door to the room.  The glass panel in the door bears the U.D.C. insignia, which consists of the first national flag used by the Confederate States of America. *See* The Editors of Encyclopedia Britannica, "flag of the Confederate States of America," *Encyclopedia Britannica*, Jan. 7, 2021, https://www.britannica.com/topic/flag-of-the-Confederate-States-of-America (last visited July 24, 2022) (showing flags).  The letters "UDC," in an overlapping pattern, are beneath the flag, and the flag is encircled by a gold wreath with a ribbon tied in a bow at the bottom of the wreath.  The number "61" is on the left side of the bow, and the number "65" on the right side of the bow.[1]  "U.D.C. Room" is in gold paint beneath the insignia.

The second, third, and fourth photographs are general photographs of the room and show the furniture in the room, which includes a long table, chairs around the table, and a couch.  Several items can be seen hanging on the walls.  The fifth photograph is a closeup of one of those items:  a large, framed flag hanging on the wall opposite from the entry door.  The flag is the third national flag of the Confederacy, which was adopted by the Confederate Congress in 1865.  *See id.*  The design for the Confederate battle flag, a blue diagonal cross trimmed with white and bearing thirteen white stars on a red background,

---

[1] The American Civil War was fought from 1861 to 1865.  *See* Jennifer L. Weber and Warren W. Hassler, "American Civil War," *Encyclopedia Britannica*, April 20, 2022, https://www.britannica.com/event/American-Civil-War (last visited July 25, 2022).

appears in the upper left of the flag.  *See id.*  The sixth photograph shows a metal plaque that is fastened to the bottom of the flag's frame.  The plaque reads, "CONFEDERATE FLAG PROPERTY OF GILES COUNTY CHAPTER #257 UDC."

The seventh photograph shows a framed portrait of Jefferson Davis.[2]  A metal plaque on the bottom of the portrait reads, "PRESIDENT JEFFERSON DAVIS OWNED BY GILES COUNTY CHAPTER #257, UDC."  The eighth photograph shows the same portrait of Davis and another portrait on the adjacent wall.  The ninth photograph shows a metal plaque hanging from the bottom of the second portrait.  The plaque reads, "GENERAL JOHN C. BROWN OWNED BY GILES COUNTY CHAPTER #257, UDC."[3]

The tenth photograph shows a framed letter typed on United Daughters of the Confederacy letterhead.  The letter, which hangs to the right of the Jefferson Davis portrait, is dated March 25, 2005, and is addressed to "Ms. Cathy Gordon Wood, President, Giles County Chapter #257."  The letter reads:

Dear Ms. Wood:

Thank you for your letter informing me of the goals of your chapter.  How exciting that you wish to be more visible in Giles County!  With the replacing of the panel on the door, you will be continuing a tradition of the UDC, namely, memorial.

It is my understanding from your letter that the room in the Giles County Courthouse has been a UDC room since 1930's.  The accident concerning the panel happened between the time the Red Cross used the room during World War II, and present day.  As there is no indication of the responsibility of the damage, and your chapter is willing to accept the cost, I assume all expenses will be borne by the chapter.

I therefore give Giles County Chapter #257, Pulaski, Tennessee full authority to replace the clear glass door panel with a frosted glass panel, with the following inscription - "UDC Room" with the UDC emblem located above the lettering.

---

[2] Davis was President of the Confederate States of America.  *See* The Editors of Encyclopedia Britannica, "Confederate States of America," *Encyclopedia Britannica*, May 24, 2022, https://www.britannica.com/topic/Confederate-States-of-America (last visited July 25, 2022).

[3] John C. Brown was a Confederate general, was the governor of Tennessee from 1871 to 1875, and was born in Giles County.  *See* Anne-Leslie Owens, "John Calvin Brown," *Tennessee Encyclopedia*, Oct. 8, 2017, http://tennesseeencyclopedia.net/entries/john-calvin-brown/ (last visited July 25, 2022).

As members of the United Daughters of the Confederacy, we must continue to honor our Confederate Veterans, and share the history of the War Between the States. I thank you and your chapter for your support to the General Organization as we remember the objects of the UDC-Historical, Educational, Benevolent, Memorial, and Patriotic.

The closing reads, "In Service to the UDC," and the letter is signed by "Esther Owens Cope President General."

On cross-examination, Ms. Oakley testified that she had been working in the clerk's office for twenty-three years and that she was elected Giles County Circuit Court Clerk in November 2017. She said that she had been in the U.D.C. Room "[c]ountless" times and that no petit juror or grand juror had ever talked with her about the Confederate memorabilia in the room. Every "term," a computer selected 800 potential jurors at random from the Tennessee Department of Safety database. Ms. Oakley said that the names were selected from everyone with a driver's license in Giles County and acknowledged that the selection was "a general cross section of the community."

On redirect-examination, Ms. Oakley identified the Property Committee Minutes from the Giles County Commission's meeting on September 11, 2020. Defense counsel asked if Ms. Oakley was aware that the commission debated the items in the U.D.C. Room during the meeting, and the State objected based on relevance and hearsay. Defense counsel advised the trial court that during the meeting, "certain commissioners argued that the items in that room . . . could influence a jury in a court case. That was the debate. They voted on it, whether to leave it as it is or not." Defense counsel moved to introduce the minutes into evidence as an exhibit. The trial court found that the minutes had "some relevance." However, the trial court also found that the minutes were hearsay and not self-authenticating and, therefore, that they could be marked for identification only.

Sam T. Collins testified for the State that he was the grand jury foreman in Giles County and that he had been the foreman for eighteen years, including June 2019. He said that he thought the grand jury met in the U.D.C. Room in June 2019 but that he did not remember any grand jurors referring to a person's race. Mr. Collins did not hear the grand jurors refer to any of the Confederate memorabilia in the U.D.C. Room, and the grand jurors did not ask him any questions about the memorabilia or refer to the United Daughters of the Confederacy. He acknowledged that he had a reputation "for running a very tight ship" and said that he had never overheard a grand jury discuss a person's race or the Confederate flag.

On cross-examination, Mr. Collins acknowledged that he was "a historian" and a member of the historical society and said that he occasionally gave tours of the courthouse. Defense counsel asked how the U.D.C. Room became the jury room, and he explained,

That U.D.C. room is that because [in] 1907, this courthouse burned. And then in 1909, it was moved back into. Between 1907 and 1909, there are groups of people in Giles County that contributed money, contributed time, did things to try to benefit the restructure of this courthouse. And the United Daughters of the Confederacy outfitted that room with the table, the chairs, and the things in that. And they were allowed to put their initials, U.D.C., on the door.

Mr. Collins said that the U.D.C. did not "own" the room but that removing the confederate memorabilia from the room would require the permission of the Giles County Executive, who was responsible for the courthouse.

Mr. Collins acknowledged that it was possible people in the jury room discussed the memorabilia and that he did not hear them. However, he also acknowledged that he had never been concerned that the Confederate memorabilia in the room influenced a jury. Defense counsel asked if Mr. Collins considered the U.D.C. Room to be a "Confederate monument," and Mr. Collins answered,

No. I wouldn't consider it a Confederate monument, no. I would consider that it was done at that particular time in history, between 1907 and 1909, by a group of people who wanted to help this courthouse be put back like it should be and that they contributed to that effort, but I don't think it's a Confederate monument, no.

Mr. Collins acknowledged that the Ku Klux Klan was founded in Giles County, across the street from the courthouse. On redirect-examination, defense counsel asked if Mr. Collins had ever been concerned that a grand jury had been "influenced in a way that would be prejudicial to someone of a different race," and he responded, "Never."

At the conclusion of the hearing, the trial court asked defense counsel, "How have you shown prejudice[] in this case, this trial, this sentencing hearing, this deliberation?" Defense counsel answered, "Well, I don't believe the law requires me to show that [the jurors] changed their mind based on what they saw on the walls, as impossible as that may be to prove." The trial court stated that it disagreed with trial counsel. On June 15, 2021, the trial court entered a written order denying the motion for new trial without making any findings of fact or conclusions of law.

On appeal, the Defendant contends that a new trial is required because the Confederate memorabilia exposed the jury to extraneous prejudicial information or improper outside influence, which created a rebuttable presumption of prejudice, and

- 11 -

because the State failed to rebut the presumption.[4]  He also contends that the jury's being required to deliberate in "an inherently prejudicial Confederate jury room" violates the 14th Amendment's "protection against state-sponsored racial discrimination" and the 6th Amendment's "right to a jury trial"; the United States and Tennessee Constitutions' right to trial by "an impartial jury"; and "the trial court's duty of judicial impartiality."  Finally, he contends that the indictment was defective because the grand jury also was required to meet in the room.

Initially, we will address the State's argument that we should review the Defendant's claims for plain error.  Tennessee Rule of Criminal Procedure 12(b)(1) provides that "any defense, objection, or request that the court can determine without a trial of the general issue" may be raised before trial.  However, defenses and objections based on "a defect in the institution of the prosecution" or "a defect in the indictment" must be raised before trial.  Tenn. R. Crim. P. 12(b)(2)(A), (B).  The federal counterpart to Tennessee Rule of Evidence 12(b)(2) lists "an error in the grand-jury proceeding" as a defect in the prosecution.  Fed. R. Crim. P. 12(b)(3)(A)(v).  Although the location of jury deliberations and jury impartiality are not issues that must be raised before trial, our supreme court has held that constitutional issues should have been raised at trial, even when the issues were raised and denied in a motion for new trial.  *See State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020); *see also State v. Adolphus L. Hollingsworth*, No. E2015-01463-CCA-R3-CD, 2017 WL 111331, at *24 (Tenn. Crim. App. Jan. 11, 2017) (addressing impartial jury claim as plain error when the defendant raised it in his motion for new trial but never brought it to the attention of the trial court).

Moreover, according to the evidence presented at the Defendant's motion for new trial hearing, the Confederate memorabilia had been in the jury room for years, if not decades.  The U.D.C. name and insignia were painted on the door to the room in 2005, and Mr. Collins testified that he gave tours of the courthouse occasionally.  The attorney who represented the Defendant at trial did not testify at the hearing on the motion for new trial, so there is nothing in the record to indicate that she was unaware of the "U.D.C. Room."  Yet the Defendant did not raise any objection with regard to the jury room until he filed his motion for new trial.  "[The] failure to object within time to give the trial court an

---

[4] In support of his argument, the Defendant asserts that we are required to follow *State v. Tim Gilbert*, No. M2020-01241-CCA-R3-CD, 2021 WL 5755018, at *13-20 (Tenn. Crim. App. Dec. 3, 2021), in which a panel of this court analyzed the same issue involving the same jury room and concluded that the Confederate memorabilia in the U.D.C. Room constituted extraneous prejudicial information or improper outside influence and that the State failed to rebut the presumption that the jury's exposure to the extraneous information was prejudicial.  However, unpublished opinions constitute only persuasive authority and are not binding precedent.  *See* Tenn. S. Ct. R. 4(G)(1).  In any event, at the time the parties filed their appellate briefs and oral arguments were held in this case, Mr. Gilbert's Rule 11 application from that decision was pending to our supreme court.  Subsequently, our supreme court denied Mr. Gilbert's application for permission to appeal and designated this court's opinion "Not for Citation."  According to Rule 4(E)(1), Rules of the Supreme Court of Tennessee, opinions designated not for citation have no precedential value.

opportunity to prevent or nullify any harmful effect constitutes a waiver." *State v. Thompson*, 832 S.W.2d 577, 579 (Tenn. Crim. App. 1991) (citing Tenn. R. App. P. 36(a)). Under these circumstances, we conclude that the Defendant must show that he is entitled to plain error relief. *See State v. Jason Paul Sherwood,* No. M2005-01883-CCA-R3-CD, 2007 WL 189376, at *17 (Tenn. Crim. App. Jan. 26, 2007) (reviewing the court officer's and the defendant's interactions with the jury in the jury room for plain error when no objection was made at trial).

To be entitled to relief as plain error, a defendant has the burden to establish the presence of the following five factors: (1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice. *State v. Vance*, 596 S.W.3d 229, 254 (Tenn. 2020) (citations omitted). "'Moreover, the error must have been of 'sufficient magnitude that it probably changed the outcome of the trial.'" *Id.* (quoting *State v. Banks*, 271 S.W.3d 90, 119 (Tenn. 2008)).

Both the United States and Tennessee Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "Jurors must render their verdict based only upon the evidence introduced at trial, weighing the evidence in light of their own experience and knowledge. When a jury has been subjected to either extraneous prejudicial information or an improper outside influence, the validity of the verdict is questionable." *State v. Adams*, 405 S.W.3d 641, 650 (Tenn. 2013) (internal citation omitted.) "Extraneous prejudicial information" is defined as "information in the form of either fact or opinion that was not admitted into evidence but nevertheless bears on a fact at issue in the case." *Id.* An "improper outside influence" is defined as "any unauthorized 'private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury.'" *Adams*, 405 S.W.3d at 650-51 (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954)). "External influences which could warrant a new trial if found to be prejudicial include: (1) exposure to news items about the trial; (2) consideration of facts not admitted in evidence, and (3) communications with non-jurors about the case." *Carruthers v. State*, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003) (quoting *Caldararo v. Vanderbilt University*, 794 S.W.2d 738, 742 (Tenn. App. 1990)). Internal influences, which are not grounds to overturn a verdict, include: "(1) discussions among jurors; (2) intimidation or harassment of one juror by another; (3) a juror's personal experiences not directly related to the litigation, and (4) a juror's subjective thoughts, fears, and emotions." *Id.* (quoting *Caldararo*, 794 S.W.2d at 742).

The party challenging the validity of the verdict must make an initial showing that the jurors were exposed to extraneous prejudicial information or improper outside influence. *Adams*, 405 S.W.3d at 651. As our supreme court has explained,

[O]nce the challenging party has made the initial showing that the jury was exposed to extraneous prejudicial information or an improper outside influence, a rebuttable presumption of prejudice arises and the burden shifts to the State to introduce admissible evidence to explain the conduct or demonstrate that it was harmless.

*Id.* (citing *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005)).

Tennessee Rule of Evidence 606(b) addresses juror testimony about extraneous prejudicial information or improper outside influence. Specifically, the Rule provides,

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes, except that a juror may testify on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion; nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Tenn. R. Evid. 606(b). Our supreme court has interpreted Tennessee Rule of Evidence 606(b) as allowing juror testimony to establish the fact of extraneous information or improper influence on the juror but not allowing juror testimony regarding the effect of such information or influence on the juror's deliberative processes. *Walsh*, 166 S.W.3d at 649.

*David Keen v. State*, No. W2004-02159-CCA-R3-PD, 2006 WL 1540258 (Tenn. Crim. App. 2006), in an instructive example of this court's analysis of extraneous prejudicial information or improper outside influence. In that case, this court considered whether the petitioner, sentenced to death, was entitled to post-conviction relief "when a juror read verses from the Bible in response to another juror's statement regarding the inability to impose a sentence of death." *David Keen v. State*, 2006 WL 1540258, at *29. At the post-conviction evidentiary hearing, three jurors testified about what occurred in the jury room during deliberations. *Id.* at *27. According to their testimony, at least one juror read verses from a personal Bible and another juror recited a prayer; however, all three jurors testified that they imposed the death penalty based on the law and that the Bible passages did not influence their decisions. *Id.*

- 14 -

First, this court considered whether the jurors' testimony was admissible under Tennessee Rule of Evidence 606(b) and found that the only juror testimony that was admissible was the testimony about the verses being read aloud, the content of the verses, and the prayer being recited. *Id.* at *30. The jurors' testimony about the effect of the Bible and prayer on their minds or the minds of any other jurors was inadmissible. *Id.*

This court then addressed whether the Bible verses at issue were prejudicial. In doing so, this court noted that it could "only consider the 'four corners' of the purported extraneous information without any reference to why it was read, or the interpretation, if any, placed on it by either the reader or any other of the jurors" and that "the extraneous information must be looked at objectively rather than subjectively." *Id.* This court then concluded as follows:

> We agree with the lower court that Romans 13:1-4 is not extraneous prejudicial information. This information (the Biblical passages) does not pertain to the petitioner, the victim, or to any facts of the case. Neither does the information pertain to the Rules of Procedure nor the Rules of Evidence which apply to any criminal trial.

> Viewing the extraneous information objectively, we cannot conclude that the Biblical verses read nor the prayer spoken [out loud] were inherently and substantially prejudicial. The general testimony regarding the readings from Corinthians and Romans as well as testimony evidencing a prayer fail to establish that any specific extraneous prejudicial information was given to the jury. It is generally understood that jurors will inherently consider their own religious, moral and philosophical beliefs during penalty phase deliberations. In this regard, no one, including the courts of this state, can expect jurors to live in a vacuum, immune from any contact with extra-judicial resources, including the Bible. Thus, we are unable to conclude that a jury's exposure to a Biblical passage during deliberations is *per se* prejudicial. Additionally, while the petitioner argues that the passages read from Romans 13 are "pro-capital punishment," this Court is reluctant to make such an interpretation nor can this Court, under an objective standard, conclude that the jurors understood the passage as God's instruction to impose a sentence of death.

> A finding of reversible prejudicial error cannot be based on a mere possibility that a juror was improperly influenced. The likelihood that the juror was influenced must be substantial. The jury was instructed as to the applicable law. We presume the jury follows the law as provided by the court. The facts of this horrific murder of this eight-year-old victim are heinous and include the confession of the petitioner. Accordingly, we cannot conclude that the typical juror in this case would have not imposed a sentence

- 15 -

of death absent the reading of the Biblical passages and/or the prayer. The petitioner is not entitled to relief on this issue.

*Id.* at \*31-32 (internal citations omitted).

Turning to the instant case, the memorabilia in the jury room did not pertain to the Defendant, to any fact of the case, or to the procedural or evidentiary rules that apply to a criminal trial. Ms. Oakley, who had been the Circuit Court Clerk for Giles County since November 2017 and had worked in the clerk's office for twenty-three years, testified for the Defendant that no grand juror or petit juror had ever talked with her about the memorabilia. The Defendant did not call any jurors to testify that even a single juror closely observed the items at issue, read any plaques attached to the items, read the letter on the wall, or recognized the items as symbols of the Confederacy. In fact, no juror testified as to even noticing or being aware that the memorabilia was in the room. Likewise, no jurors testified that any juror mentioned the memorabilia during deliberations. As stated in *David Keen*, a finding of reversible prejudicial error cannot be based on the possibility that a jury was improperly influenced. Although it would have been impermissible for any juror to testify about the effect the memorabilia had on deliberations or on any juror's decision-making process, jurors could have testified that they were aware of the items and that they recognized the items as symbols of the Confederacy. While we certainly do not condone the presence of the memorabilia in the jury room, we conclude that the Defendant failed to show that any specific extraneous prejudicial information was improperly brought to the jury's attention or improperly brought to bear upon any juror (or grand juror). Therefore, no unequivocal rule of law was breached.

Additionally, the Defendant admitted to possessing the drugs. Thus, the only issue before the jury was whether he possessed them for sale or personal use. As explained in the previous section, the evidence in this case was overwhelming that the Defendant possessed the drugs for sale. Accordingly, we also conclude that consideration of the error is not necessary to do substantial justice.

As to the memorabilia being inherently prejudicial, we question whether the average citizen would recognize the portraits of Jefferson Davis or John C. Brown, the insignia for the United Daughters of the Confederacy, or the third national flag of the Confederate States of America. We acknowledge that the Confederate battle flag has become a controversial symbol in this country. *See United States v. Blanding*, 250 F.3d 858, 861 (4th Cir. 2001) ("It is the sincerely held view of many Americans, of all races, that the confederate flag is a symbol of racial separation and oppression."); *West v. Derby Unified School Dist. No. 260*, 23 F. Supp. 2d 1223, 1233 (D. Kan. 1998) ("To many . . . displaying this flag today represents an expression of continuing contempt for the rights of African-Americans to participate fully and equally in American society."); *see also D.B. ex rel. Brogdon v. Lafon*, 217 F. App'x 518, 523-24 (6th Cir. 2007) (quoting federal court opinions

regarding the Confederate battle flag's "inherent racial divisiveness"). However, the flag in this case is not the Confederate battle flag.

Finally, the Defendant claims that the memorabilia violated the trial court's duty of judicial impartiality. As noted by the State, though, issues raised for the first time on appeal are waived. *See* Tenn. R. App. P. 36(a); *State v. Johnson*, 970 S.W.2d 500 (Tenn. Crim. App. 1996) ("Issues raised for the first time on appeal are considered waived."). In sum, we conclude that the Defendant is not entitled to plain error relief on this issue.

### III. Motion to Withdraw

Next, the Defendant claims that the trial court erred by denying defense counsel's motion to withdraw from representation. The State argues that the Defendant has waived this issue because the record is incomplete for our review. We agree with the State.

Two days before trial, defense counsel filed a motion to be relieved as counsel. In the motion, defense counsel asserted as follows: On November 25, 2019, defense counsel met with the Defendant, and they discussed his case. During the meeting, defense counsel telephoned the "arresting officer" to ask him a question. Defense counsel made the call in the Defendant's presence, and the Defendant knew what defense counsel said to the officer and what the officer said to defense counsel. Defense counsel was supposed to meet with the Defendant in defense counsel's office on February 7, 2020, to go over his "entire case" before trial; however, the Defendant did not show up for the meeting. Defense counsel began trying to locate the Defendant, and the Defendant eventually telephoned defense counsel. Defense counsel asked why the Defendant missed his appointment, and he told her that "due to counsel knowing the police and being able to call and ask them questions that she would not 'fight' for him and was on the police departments side." Defense counsel then stated in the motion, "Based on defendant's accusations that counsel would throw the case, Counsel states that such a gap has been created between the Defendant and counsel that Counsel cannot represent him and asks this Honorable Court to allow her to be relieved as counsel."

After the jury was selected on the first day of trial, defense counsel reminded the trial court about her motion and stated,

> We came in to court yesterday at that motion. Your Honor denied the motion and told Mr. Martin to go sit down and talk with me.

> We did go sit down and talk. And after finally getting him calmed down and getting him to listen where I explained to him where we were, we were able [to] discuss the case.

- 17 -

So I think we are in a fairly decent position at this point, Judge, but, yes, it did take quite a bit of talking and things yesterday and stuff.

The trial court addressed the Defendant and said, "I just want to encourage you, Mr. Martin, to work with [defense counsel]. She is one of our experienced, more experienced and very good defense lawyers. She will fight for you. She is not on the police side. So I just wanted to say that to you."

The record reflects that trial counsel was appointed to represent the Defendant. Tennessee Code Annotated section 40-14-205(a) provides, "The court may, upon good cause shown, permit an attorney appointed under this part to withdraw as counsel of record for the accused." The decision of whether to substitute counsel is within the sound discretion of the trial court. *State v. Gilmore*, 823 S.W.2d 566, 569 (Tenn. Crim. App. 1991).

The trial transcript reflects that the trial court held a hearing on defense counsel's motion to withdraw and that the trial court denied the motion. However, the Defendant failed to include a transcript of the hearing in the appellate record. We note that the Defendant filed a reply brief but that he did not address the State's waiver argument and that he did not file a motion to supplement the record with the missing transcript. *See* Tenn. R. App. P. 24(g). Without the transcript, we are unable to review what occurred during the hearing and, therefore, are unable to determine whether the trial court properly denied defense counsel's motion to withdraw. *See* Tenn. R. App. P. 24(b). In any event, the next day, defense counsel advised the trial court that she and the Defendant "were able [to] discuss the case" and that they were "in a fairly decent position at this point." The Defendant did not say anything to contradict defense counsel and never requested that she be removed from his case. Therefore, we conclude that he is not entitled to relief. *See* Tenn. R. App. P. 36(a).

## IV.  Defendant's Letter

The Defendant contends that the trial court erred by excluding a letter he wrote from evidence. The State argues that the Defendant has waived this issue. We conclude that the Defendant is not entitled to relief.

After Lieutenant Young's direct testimony, the trial court announced a lunch break. When the parties returned to the courtroom, the prosecutor advised the trial court that while the Defendant's case was pending before the grand jury, she received a letter from the Defendant that was postmarked June 4, 2019. The prosecutor further advised the trial court that she gave the letter to the Defendant's first appointed attorney and discussed the letter with him; however, that attorney subsequently was replaced by defense counsel. The prosecutor stated that during the lunch break, she learned that the letter was not in the discovery materials and that defense counsel never received the letter. Defense counsel

- 18 -

confirmed to the trial court that the letter was not in discovery and that she found out about the letter during the lunch break. Defense counsel stated, "I would be objecting to any use of that letter." The prosecutor responded that she was not going to use the letter in the State's case-in-chief and that she "only had it in case the defendant testified in some way." The trial court asked about the contents of the letter, and the prosecutor answered, "[S]omething to the [e]ffect of it was for personal use." The trial court ruled, "Well, we're not going to use it, period."

At the Defendant's motion for new trial hearing, Hershell Koger testified for the State that he initially was appointed to represent the Defendant and that the assistant district attorney general sent him a copy of the letter. Mr. Koger said that he reviewed the letter and acknowledged that the letter "could be deemed exculpatory." He said that he did not review the letter with the Defendant or send the letter to the Defendant because "[m]y thought would be that he would know what he sent to the DA." Mr. Koger received the letter prior to receiving the discovery materials, and he put the letter in the Defendant's file. The letter remained in the file in Mr. Koger's office; therefore, the letter did not get turned over to defense counsel with the discovery materials.

The State introduced the two-page, single-spaced letter into evidence. In the letter, the Defendant wrote, in pertinent part, "The night of my situation me and a few friends of mine all purchased the cocaine and marijuana to split in half for usage not to sale. I was not going to sell any of it."

Tennessee Rule of Criminal Procedure 16(a)(1)(C) provides that upon a defendant's request, the State must allow the defendant to inspect and copy certain evidence which is material to the preparation of the defendant's defense or that the State intends to use as evidence in its case-in-chief. If the State fails to comply with this rule, the trial court has the discretion to fashion an appropriate remedy, including granting a continuance or prohibiting the introduction of the evidence. Tenn. R. Crim. P. 16(d)(2)(C). Furthermore, in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that the State has a constitutional duty to furnish the defendant with exculpatory evidence pertaining to the defendant's guilt or innocence or to the potential punishment faced by the defendant. In order to establish a *Brady* violation, a defendant must show that: (1) he or she requested the information (unless the evidence is obviously exculpatory, in which case the State is obligated to release such evidence regardless of whether or not it was requested); (2) the State suppressed the information; (3) the information was favorable to the defendant; and (4) the information was material. *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995).

On appeal, the Defendant contends that the trial court erred by ruling that the letter was inadmissible because the letter was exculpatory and because the State failed to turn over the letter during discovery, which hindered defense counsel's trial preparation. However, the Defendant knew he sent the letter to the assistant district attorney general,

and he knew the contents of the letter. Moreover, the letter contradicted his sworn testimony that he was the middleman for the drug transaction and that he did not know the cocaine was in the bag with the marijuana. Regardless, it was the Defendant who sought to exclude the letter, and the trial court granted his request, which was an appropriate remedy pursuant to Tennessee Rule of Criminal Procedure 16. Therefore, we conclude that he is not entitled to relief. *See* Tenn. R. App. P. 36(a).

## V. Investigator Shirey's Testimony

The Defendant claims that the trial court erred by allowing Investigator Shirey to testify that the average cocaine user would not possess eight grams of cocaine for personal use. He contends that the testimony misled and confused the jury because it ignored the possibility that a user could possess eight grams of cocaine to be used over the course of multiple days. The State argues that the trial court did not err. We agree with the State.

During Investigator Shirey's testimony, the State asked if he had experience with users of marijuana and cocaine, and he answered, "Yes, ma'am." The State then asked, "What's a low to high range for a user of cocaine per day?" Defense counsel objected on the basis of relevance, and the trial court overruled the objection. Investigator Shirey answered, "I work [with] a lot of informants, and the informants being in this world of either using narcotics or purchasing, so I get to talk to them on a daily basis. So your average person that uses cocaine will not basically use more than two grams a day[.]" The State later asked him, "Is eight grams of cocaine, is that a typical amount that you have seen for personal use?" Investigator Shirey said no and that a person either would sell eight grams of cocaine by the gram or as two eight balls.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Even relevant evidence may be excluded, though, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Questions regarding the admissibility and relevancy of evidence lie within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

In this case, the State charged the Defendant with possession of cocaine with intent to sell. Therefore, evidence that the amount of cocaine in the car was consistent with the amount a person would have for sale and not for personal use was highly relevant to the State's case. Accordingly, we do not think the probative value of Investigator Shirey's testimony was substantially outweighed by the danger of unfair prejudice, confusion of the

issues, or misleading the jury. We note that defense counsel did not cross-examine Investigator Shirey but that defense counsel could have asked him if it was possible the Defendant possessed eight grams of cocaine for multiple days of personal use. *See* Tenn. R. App. P. 36(a). Moreover, Lieutenant Young testified, without objection, that the amount of cocaine found in the Defendant's car was more than an average person would possess for personal use. *See* Tenn. R. App. P. 36(b). Therefore, we conclude that the Defendant is not entitled to relief on this issue.

## VI. Alternative Sentencing

The Defendant claims that the trial court erred by denying alternative sentencing. The State argues that the trial court properly ordered the Defendant to serve his effective twelve-year sentence in confinement. We agree with the State.

At the Defendant's sentencing hearing, Markeyta Bledsoe of PSI Probation testified that the Defendant was placed on probation on May 13, 2019, for simple possession of marijuana and resisting arrest and that she began supervising him in September 2019. In February 2020, the Defendant passed a drug screen. However, in April 2020, Ms. Bledsoe filed a probation violation report due to his failure to make payments on his court costs. The Defendant last reported to Ms. Bledsoe on May 18, 2020. Ms. Bledsoe tried to contact him but did not see him again. Therefore, she amended her initial probation violation report to include his failure to report.

On cross-examination, Ms. Bledsoe testified that the Defendant was supposed to report to her in person on June 10, 2020. He did not show up for the meeting but telephoned her. The Defendant was supposed to meet with Ms. Bledsoe again in person on June 29, 2020, but she did not hear from him. On redirect-examination, Ms. Bledsoe testified that she "tried to accommodate" the Defendant because he said he was employed.

Bethany Sisseck of the Board of Probation and Parole testified that she prepared the Defendant's presentence report. The Defendant gave a statement for the report in which he claimed that the cocaine in his car did not belong to him and that he had the marijuana for personal use. Ms. Sisseck investigated the Defendant's prior criminal history and obtained copies of his certified judgments of conviction. The Defendant had fifteen prior misdemeanor convictions, including convictions of criminal trespass; possession of drug paraphernalia; driving on a revoked license, fourth offense; resisting arrest; failure to appear; driving on a suspended license; underage drinking; and four convictions of simple possession of marijuana. The Defendant also had numerous probation violations. He told Ms. Sisseck that he did not graduate from high school but that he was in a GED program at Tennessee Tech. Ms. Sisseck verified that the Defendant was enrolled in the program but learned that he was not attending the classes. The Defendant told Ms. Sisseck that he was working at Nissan through a temporary agency and that he was working at Tenneplas.

Ms. Sisseck contacted the Defendant's employers and was told that he no longer worked for them.

The State introduced the Defendant's presentence report into evidence. In the report, the Defendant described his physical health as "good" and his mental health as "excellent." He denied having any physical or mental health conditions. He said that he began consuming beer when he was twenty-one years old but that he was "a social drinker" and did not consume alcohol often. He also said that he began using marijuana in 2010 and that he smoked about three "joints" per day. The Defendant stated that he was still using marijuana and that he could not pass a drug screen.

The Defendant's Strong-R assessment was attached to his presentence report and classified his overall risk to reoffend as low. The assessment concluded that he had high needs relevant to "Attitudes/Behaviors" and "Residential"; moderate needs relevant to "Friends," "Family," and "Education"; and low needs relevant to "Aggression," "Mental Health," "Alcohol/Drug Use," and "Employment."

The Defendant gave an allocution in which he said he was a media and promotion manager for a music company and that he finally had a career he loved and enjoyed. He stated that he also worked for a moving company and that he was living with a roommate in an apartment in Huntsville, Alabama. The Defendant told the trial court that he came from a "broken" home, that his parents used drugs, and that he ended up in state custody until he was seventeen years old. The Defendant stated that he was not a drug dealer and that he had smoked marijuana his "whole" life because he did not have any parenting or structure. The Defendant said that he never sold drugs, that "trying to middle-man for a friend" was the worst mistake he ever made, and that he did not know cocaine was in the bag of marijuana. The Defendant stated that he had a son, that his family and career were "worth everything" to him, and that he knew he could be a great father. The Defendant promised to follow the rules of probation and said he would "remain a productive citizen of society and a father who will always provide for his family."

The trial court noted that the Defendant was about to turn thirty-one years old and that he had been in the criminal justice system "for many years, probably 12 or so, beginning at age 19." The trial court stated that the Defendant "downplays pretty much everything" and found his claims of being the middleman for the drugs and not knowing the cocaine was in his vehicle not credible. The trial court also found the Defendant's claims of taking GED classes and having a strong work history not credible. The trial court stated that the Defendant "has had a lot of chances by a very soft criminal justice system" and that rehabilitation was unnecessary due to his "chosen lifestyle of smoking marijuana."

The trial court found that the following enhancement factors applied to the Defendant's felony convictions: (1) the Defendant has a previous history of criminal convictions or behavior in addition to those necessary to establish the appropriate range;

(8) the Defendant, before trial or sentencing, failed to comply with the conditions of a sentence involving release into the community; and (13) the Defendant was on bond and on probation at the time the felonies were committed. *See* Tenn. Code Ann. § 40-35-114(1), (8), (13)(A) & (C). The trial court gave "pretty substantial weight" to enhancement factor (1) and "great weight" to enhancement factors (8) and (13). The trial court found no mitigating factors applicable and sentenced the Defendant as a Range I, standard offender to twelve years for possession of one-half gram or more of cocaine with intent to sell, a Class B felony; two years for possession of not less than one-half ounce of marijuana with intent to sell, a Class E felony; and eleven months, twenty-nine days for possession of drug paraphernalia, a Class A misdemeanor. The trial court ordered that he serve the sentences concurrently with each other but consecutive to the prior sentences for which he was on bond and probation. *See* Tenn. R. Crim. P. 32(c)(3)(A), (C).

As to alternative sentencing, the trial court found that the Defendant had a history of violating probation and that he would not abide by the terms of probation in this case. The trial court concluded that confinement was necessary to avoid depreciating the seriousness of the offenses and that confinement was particularly suited to provide an effective deterrence to others likely to commit similar offenses. *See* Tenn. Code Ann. § 40-35-103(1)(B).

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 79 (Tenn. 2012) (applying the standard to alternative sentencing). In determining a defendant's sentence, including the manner of service, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Defendant in his own behalf; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98. The burden is on the Defendant to demonstrate the impropriety of his sentence. *See* Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

Regarding alternative sentencing, a defendant is eligible for alternative sentencing if the sentence actually imposed is ten years or less. *See* Tenn. Code Ann. § 40-35-303(a). Moreover, a defendant who is an especially mitigated or standard offender convicted of a Class C, D, or E felony should be considered a favorable candidate for alternative sentencing absent evidence to the contrary. *See* Tenn. Code Ann. § 40-35-102(6)(A). The

following sentencing considerations, set forth in Tennessee Code Annotated section 40-35-103(1), may constitute "evidence to the contrary":

      (A)  Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

      (B)  Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

      (C)  Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Additionally, a court should consider a defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. *See* Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

Turning to this case, we note that the Defendant claims his twelve-year sentence for possession of cocaine is "unreasonable" but that he does not contest the trial court's application of enhancement factors (1), (8), or (13) or make any argument as to why his sentence is excessive. Regarding alternative sentencing, he asserts, without any explanation, that confinement is not necessary to avoid depreciating the seriousness of the offenses and that confinement is not particularly suited to provide an effective deterrent to others likely to commit similar offenses. He also asserts that the record supports finding that he is a prime candidate for rehabilitation, noting his candor about his marijuana use and inability to pass a drug screen, and supports finding that he has a low risk of reoffending.

We conclude that the record supports the trial court's denial of full probation or other form of alternative sentencing. The Defendant is not eligible for probation for his conviction of possession of one-half gram or more of cocaine with intent to sell because his sentence is twelve years. He also is not considered to be a favorable candidate for alternative sentencing because that conviction is a Class B felony. In any event, the trial court considered the relevant sentencing principles, applied them to the facts of this case, and denied alternative sentencing based on Tennessee Code Annotated section 40-35-103(1)(B). Additionally, the trial court determined that the Defendant should serve his sentences in confinement because he has repeatedly violated probation and because his potential for rehabilitation is poor due to his continued use of marijuana. We agree with the trial court. Therefore, we affirm the trial court's denial of alternative sentencing.

**VII. Cumulative Error**

Finally, the Defendant argues that the cumulative effect of the errors in this case warrants reversal of his convictions. However, because we have concluded that the trial court did not commit any errors, the Defendant is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

Upon our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE